Beulah Smith McNARY et al., Appellants,

v.

Jack REEVES, Individually and d/b/a Mobil Oil Station, et al., Appellees.

No. 8007.

Court of Civil Appeals of Texas, Texarkana.

Nov. 24, 1970.

Rehearing Denied Dec. 22, 1970.

L. F. Burke, Longview, for appellants.

Earl Roberts, Jr., John M. Smith, Smead, Roberts, Harbour, Smith, Harris, French & Parker, Longview, for appellees.

CHADICK, Chief Justice.

On September 16, 1968, Jack Reeves began construction of an automobile service station on a 1.077 acre tract of land in the Isaac Skillern Survey of Gregg County, Texas. The structure erected extended well into and occupied a significant portion of a vehicle passageway approximately 25 feet wide along the north side of the 1.077 acre tract. Beulah McNary, in her own behalf "and for the general public similarly situated", instituted a lawsuit naming "Jack Reeves, Individually, and dba Mobile Oil Station, and Maggie Lee Reeves, Individually, and as Independent Executrix of the Will of Homer L. Reeves, deceased", as defendants for the purpose of enjoining the defendants named from obstructing the passageway, for damages, etc.

The tract upon which Reeves built is a rectangular lot severed from a 10.4 acre tract which was set apart to Mary Smith, mother of Beulah McNary, in a division of the estate of Charlie Key, deceased. The instrument evidencing the conveyance of the 10.4 acre tract to Mary Smith is dated January 13, 1928. In 1931 Mary Smith and her husband built a house on the 10.4 acre tract, and the passageway here in question

was the driveway or road from their house to the Pine Tree public road. This passageway is frequently referred to in the record as Conrad Street, but such reference in the discussion that follows is for convenience in expression and does not imply a determination by this court that the passageway has the characteristics of a public street or road. The evidence, excepting certain details to be examined and discussed separately, is unquestioned that since 1931 the public made the same common, conventional and routine use of the driveway that is made of an ordinary public street, and that before the area was incorporated into the City of Longview the county graded and improved the strip. Prior to incorporation a local improvement association in the Greggton community assigned it Fifth Street as a name, and put up street markers accordingly. The City of Longview changed the name to Conrad Street and erected street markers so designating it and continued maintenance after incorporation. All the while Mary Smith and her successors in title, particularly Beulah McNary, continued to use the strip for passageway in common with the public. At the time appellee Jack Reeves started construction he was aware of the passageway, its use and posted name.

In 1944 Mary Smith died. Appellant, Beulah McNary, is one of her seven children. In 1954 these children partitioned the 10.4 acre tract by executing warranty deeds to each other. Matthew Smith received a 1.077 acre tract fronting on Pine Tree Road. This tract was subsequently conveyed to H. L. Reeves, and a strip thereof now called Conrad Street is the subject of this lawsuit. Beulah McNary was deeded an 1.077 acre tract immediately adjacent and east of Matthew Smith's tract; and at the date of the lawsuit her house and place of residence occupied the lot. Matthew Smith's tract lay between Beulah McNary's tract and Pine Tree road. In 1954 Matthew Smith conveyed his 1.077 acres to Billy Ray Martin by warranty deed. Thereafter, on June 8, 1964, Matthew Smith and Billy Ray Martin, by warranty deed prepared by Billy Ray Martin as Matthew

Smith's attorney, conveyed the same tract to H. L. Reeves. Besides the usual provisions of a warranty deed this last instrument contained this language, to-wit: "This conveyance is made subject to any all restrictions, reservations and easements of record."

In the trial of the case four special issues were submitted, two conditional, and in compliance with the trial court's instructions only the first two were answered; such issues and the jury answers are as follows, to-wit:

"SPECIAL ISSUE NO. 1: Do you find from a preponderance of the evidence that prior to May 12, 1969, a roadway known as Conrad Street and identified on Plaintiff's Exhibit No. 1, designated as XYQZK, was dedicated, as that term is defined herein, as a public road by the owners of the land across which said road traveled?

Answer 'yes' or 'no'.

ANSWER: No

You are instructed that an intent to dedicate land for the purpose of a public road by the owner must be shown by his act and declaration; and such act and declaration should clearly and unmistakably show his intent to dedicate the land absolutely and irrevocably to the use of the public and an acceptance thereby by the public.

"SPECIAL ISSUE NO. 2: Do you find from a preponderance of the evidence that the tract shown on Plaintiff's Exhibit No. 1, designated as XYQZX was used as a public road continuously, open and adversely for any period of ten consecutive years or longer prior to the filing of this suit?

Answer 'yes' or 'no'.

ANSWER: No.

You are further instructed that the term 'adverse possession' is defined as the actual and peaceable appropriation of

land commenced and continued under a claim of right inconsistent with and hostile to the claim of another.

The term 'hostile' is defined as a using of the road by the general public with the intent to claim it to the exclusion of any inconsistent claim or use of the road by the owner or owners of the land across which it runs. The use of the road by the owners and others at the same time raises the presumption that the use by others is permissive only and there must be present sufficient evidence to show use by the others under a claim of right. Mere joint use of the road by the owner and the public at the same time is not determinative.

"If the nature of the use is such as to show the owner that the users are claiming under a right independent of any permission from owner there is a requisite adverseness. In other words, the mere joint use of the road by the owners and others during the same time is not destructive of a conclusion of adverseness if there are other facts present to show use by others is under a claim of right in themselves."

Unanswered special issue Number 3 inquired whether or not the use by the general public of the roadway was with the acquiescence of the plaintiff and the other owners of the property the passageway crossed, and Number 4 submitted the question of damages. A recovery by the plaintiff was limited by the charge to proof of dedication or adverse use.

The appellant Beulah McNary has briefed 32 points of error. The appellant's brief earnestly advocates reversal on the ground that the proof showed a dedication of the strip to public use as a matter of law, and alternatively, that as a matter of law the public acquired an easement for street purposes by adverse use. Also, no evidence, insufficient evidence and great weight and preponderance of the evidence points of error are urged. In addition, the charge, instructions and issues submitted by the court are attacked as erroneous, as well as the failure of the court to submit certain requested issues and instructions.

In consummating a division of the Mary Smith 10.4 acre tract, Beulah McNary and other heirs (except Matthew Smith) by warranty deed conveyed to Matthew Smith the 1.077 acres heretofore mentioned as having been set apart to him. The conveyance was made subject to any reservations or restrictions of record. Later, Matthew Smith made the conveyance to H. L. Reeves heretofore mentioned, subject to restrictions, reservations and easements of record. There is no evidence that the strip called Conrad Street was at any time prior to the time of the Beulah McNary et al to Matthew Smith deed, or Matthew Smith to H. L. Reeves deed characterized or shown as a public street, road or passageway of any nature by any restriction, reservation or easement in an instrument recorded in the deed records of Gregg County, Texas. The absence of a recorded reservation or easement forces the question of estoppel by deed to first consideration. Beulah McNary and her co-grantors in the deed to Matthew Smith recited that for the considerations set out they "granted, sold and conveyed, and by these presents do grant, sell and convey unto Matthew Smith" the property described. Such language in the conveyance implies a covenant, as a matter of law, that the estate granted is free from encumbrances. Tex.Rev.Civ.Stat.Ann. art. 1297 (1962).

■ Having convenanted that she had an unencumbered title to the strip, equity will not permit Beulah McNary to deny that she had title to the strip at the time of her conveyance for the purpose of defeating the title of her grantee, Matthew Smith, and those in privity with him, H. L. Reeves and his successors in title. The following excerpt from 28 Am.Jur.2d Estoppel and Waiver, § 10 (1966) aptly states the doctrine:

"  *   *   *  The well-established general principle is that a grantor and his privies

are estopped as against the grantee and those in privity with him to assert anything in derogation of the grant or from denying the truth of any material facts stated in the conveyance.

"* * * One who assumes to convey an estate by deed will not be heard for the purpose of defeating the title of the grantee, to say that at the time of the conveyance he had no title, or that none passed by the deed, and he cannot deny the full operation and effect of the deed as a conveyance. In other words, he is estopped to dispute the title granted. The rule is frequently stated in the broad language that a grantor of land with full covenants of warranty is estopped to claim any interest in the granted premises, or that the grantee and his successors have less than the interest conveyed. * * *"

The conclusions stated are supported by such authorities as McClung v. Lawrence, 430 S.W.2d 179 (Tex.Sup.1968); Fannin Investment and Development Co. Inc., v. Neuhaus, 427 S.W.2d 82 (Tex.Civ.App. Houston 1968, no writ); 22 Tex.Jur.2d Estoppel, § 3 (1961); 31 C.J.S. Estoppel §§ 10 and 13 (1964).

■ At this point it becomes necessary to consider related questions. The appeal record shows that the strip was designated and treated as a street by the state, county and city authorities, particularly by a Resolution of the City Council, an official city plat, official State Highway Department maps and drawings pertaining to the state highway system, as well as official records of other governmental subdivisions. The state's Registration statutes, Tex.Rev.Civ. Stat.Ann. Arts. 6591 through 6652, (1969), provide a comprehensive, convenient and effective method of exhibiting publicly the condition of land titles in a county, and all purchasers of land therein are conclusively presumed to have notice of the condition of a title reflected by the recordation of instruments in compliance with registration laws. Mention in a deed of reservations

and exceptions of record, as in this instance, refers to the county registration records, in the absence of proof to the contrary, because such records are the sole legal method of giving binding public notice of the reservation or exception; in the context of a deed, reference to other records for title information, unless the record is specified, would be meaningless. It has been previously mentioned that no reservation, or exception, indicating the strip in question was a public street had been recorded in the Gregg County Deed Records in compliance with the recordation statutes. It would follow that the strip called Conrad Street was not excepted from the conveyance or reserved as a street by either Beulah McNary's deed to Matthew Smith, or Matthew Smith and Billy Ray Martin's deed to H. L. Reeves.

■ Appellant Beulah McNary did not plead and does not rely for recovery upon a theory of a right-of-way by necessity or an easement appurtenant to and essential to full enjoyment of adjacent lands retained by her as a grantor. But sufficient time has elapsed since the date of her deed in 1954 and before suit for the strip to have been converted to a public street by adverse use, and of course, during such time a dedication of the strip to street purposes might have been made. Sec. 2, Tex.Jur.2d Easements, Secs. 13, 16 and 25 (1961); see also 28 Tex.Jur.2d Highway and Streets, Secs. 8 through 20. Earlier the issues submitting adverse use, as well as dedication, together with the jury's findings thereon, were copied. The evidence is sufficient to support the jury's answers. Under this record it is not necessary to decide, but it is questionable whether the evidence, when confined to the period between 1954 and the date of the suit, actually raises such issues. Both Beulah McNary and her brother, Matthew Smith, testified that their parent Mary Smith and her husband dedicated the strip as a public road, but they were referring to actions occurring many years before 1954. Since Beulah McNary was estopped to assert anything in deroga-

tion of the title passed by her deed made in 1954, she was necessarily confined to facts showing either adverse use for the limitation period or a dedication after the date of her 1954 deed. Estoppel aside, review of the evidence shows it is sufficient to support the jury's findings to the special issues though all evidence adduced be considered.

In connection with the discussion in the immediately preceding paragraph, account should be taken of Beulah McNary's class action pleading. It appears from the pleadings that the rights sought to be enforced, so far as "the general public similarly situated" is concerned, are several rather than joint rights. Each member of the public similarly situated, that is, each member of the public suffering injury to a material property right might, if the strip is a public street, enforce his individual right. 28 Tex.Jur.2d, Secs. 196, 199 (1961). Joinder of the general public similarly situated as a party to the action is neither necessary nor indispensable. See 1 Mc-Donald's Texas Civil Practice, Parties, Sec. 3.34.1 (1965). In a class action of this nature the rights of the parties making up a class do not give Beulah McNary a stronger case or rights that she does not have individually. All American Airways v. Elderd, 209 F.2d 247 (CA2d 1952); Nagler v. Admiral Corporation, 248 F.2d 319 (CA 2d 1957). The present rule pertaining to class actions, Tex.R.Civ.P. 42, was adopted unchanged from Federal Rule 23(a) (c).

All of appellants' points of error have been considered. No error requiring a reversal of judgment is found. The points of error are respectfully overruled and the judgment of the trial court is affirmed.

DAVIS, Justice (dissenting).

I dissent. After carefully considering the Motion for rehearing, I have decided, without any doubt whatever, that the evidence, both oral and documentary, are fully sufficient to create a public right-of-way, and/or public street, by dedication, parol gift, prescription, documentary evidence, and limitations.

When appellants and appellees had closed the evidence in the case and rested, appellants filed a motion to withdraw the case from the jury and enter judgment in their favor. It was overruled. The charge was prepared. Appellants made several objections and exceptions thereto. They were overruled. After the jury returned its verdict in favor of appellees, appellants filed a motion to enter judgment in their favor non obstante veredicto. It was overruled. Appellants then filed a motion for a new trial in which they sought a judgment non obstante veredicto; and, in the alternative, a motion for a new trial. The motion was overruled.

This suit was brought by Beulah Smith McNary, individually, and in behalf of the public; some of the public lived on the enclosed right-of-way. This dissenting opinion was writen in a hurry. Frankly, if I remember correctly, Matthew Smith executed the deed to Jack Reeves. Matthew Smith is not a party plaintiff to this lawsuit.

I will quote extensively from the oral testimony. But, first, I will point out that the right-of-way was first dedicated as a public road prior to 1930. It was dedicated as a public right-of-way along the North line of a tract of land that was owned by Mary Smith, Mother of the appellant, Beulah Smith McNary. At that time, it was a county road. It was graded up by the County Commissioner, his employees with county machinery, was graveled and oiled and has been maintained by the County and cities and used by the public ever since as a public road.

At one time the place where the right-of-way is situated was known as Willow Springs. Then, Greggton was organized and became an incorporated city and it gave the county road the name of "5th Street"; thereby, recognizing it as a public right-of-way or a street. Later, Greggton and Longview voted to incorporate

with each other and be called "Longview". Longview then changed the name of the street to "Conrad Street", and adopted a Resolution which became a part of the documentary evidence which was offered into evidence, that Conrad Street was a public street for the use of everyone who desired to use it.

The oral testimony to support the right-of-way is now quoted.

Matthew Smith, testified, in part, as follows:

"Q. Do you know of anything your Mother did (during her life time) with reference to the North side of this tract of land she inherited as being an heir under the Keys?

A. Mother dedicated a road for life, as long as there is anyone that's living, and give it to the public on her own property.

Q. I believe that road is along the North side of the tract, is that not right?

A. It is on the North side of the tract.

Q. Does that road intersect Pine Tree Road?

A. It intersects right at Pine Tree Road, which is called Conrad Street today.

Q. State whether or not that road, since the time it was dedicated by your Mother as a public road, has been used by the public uninterruptedly since that time?

A. That road has been used by the public free from access or no violence whatsoever from 1931 up until 1968.

Q. Now, prior to that time, did or did not the public use this road exclusively for a passageway?

A. That road was used by the public for anything and everything that went over it. They used that road to drill the gas well which is down on the fourth block from my property, going east.

Q. All right—During the time that you lived out there on that road, what are the facts with reference to its use by doctors coming to see people back to the east on that road from Pine Tree Road?

A. We used that road for doctors, undertakers, milkmen and everybody used that road.

Q. How about the icemen?

A. The iceman, regardless of who wanted to go up and down that road, they had free choice to use that road.

Q. Did at any time during the time that this road was dedicated by your Mother, anyone have to come to you or your brothers and sisters and get permission to use that road?

A. Did not.

Q. Did you or any of your brothers and sisters ever attempt to keep the public from using it?

A. No, did not.

Q. And did you all (Smith and Reeves) have a conversation about it (the road) at the time?

A. Yes, we did.

Q. Was the road at that time visable as a road, were there any trees, shrubbery or anything to—

A. Was not, because when he (Mr. Reeves) come to see me, he came from the Pine Tree road up Conrad Street up to my sisters where I am living now.

Q. I will ask you if this strip of land on the North side of the tract of land you sold to Mr. Reeves (appellee) has ever been used for anything else other than a road?

A. Never has.

Q. Never has?

A. For the public, a public road.

Q. Never has been used for anything except a road out to Pine Tree?

A. Yes."

\*   \*   \*   \*   \*   \*

"A. I told him there was a road and I would want to maintain the road through here for my sisters and all others to go back and forth, that was the outlet and was the way I sold the property, under that understanding.

Q. What, if anything, did he tell you he would do with reference to this road?

A. He told me, said he would leave the remainder of the road there, he never would close the road. We would have free access of the road.

Q. If he hadn't of told you that would you or not have sold him the land?

A. I wouldn't have."

On cross-examination, Matthew Smith testified:

"A. I agreed when I sold the property that the road would remain in use for the public."

\*   \*   \*   \*   \*   \*

"A. When my sisters give me the deed to my property, they didn't give me the road at that particular time because we all excepted and give that to the public."

\*   \*   \*   \*   \*   \*

"Q. All right, and is it your testimony that you want Mr. Reeves to have title to whatever you conveyed him in this deed?

A. All except the free will of the public of the road."

\*   \*   \*   \*   \*   \*

"A. All I want is the free passage for the roadway left open for the public."

\*   \*   \*   \*   \*   \*

"Q. Then, as a man of your word, I am asking you since you warranted this title, if you want this man, Mr. Reeves to have the land that you conveyed to him in this deed right here?

A. All except the passway for the public.

Q. All right, that's what you want him to have, isn't it?

A. All except the passway for the public, give the public a free passway to go out to the street."

\*   \*   \*   \*   \*   \*

"A. It was made of record. The city of Longview named the street and it's on the record 'Conrad Street' and it's in the telephone book 'Conrad Street' and it's at the City Hall 'Conrad Street'.

\*   \*   \*   \*   \*   \*

"A. And I got a permit in my pocket here—

Q. Not in the County Clerk's Office?

A. A license permit to pave Conrad and my license permit for breaking out curbing says, 'on Conrad Street'. I am a licensed contractor of concrete work."

\*   \*   \*   \*   \*   \*

"Q. And you are using this road in front of Beulah's house just like Beulah is using it, aren't you?

A. That's right, and the public is using it.

Q. So, along with everybody you knew, you and your family used it, is that right?

A. Me and my family used it, the public and—

Q. Everybody?

A. The public in general."

\*   \*   \*   \*   \*   \*

"Q. They started going across your Mamma's land with her permission?

A. Well, it wasn't with her permission because Mamma said, when we opened the road, Mother said, 'This road will be dedicated to the public.'"

\*   \*   \*   \*   \*   \*

Beulah Smith McNary, one of the appellants, testified, in part, on direct examination, as follows:

"Q. Well, who opened that road?

A. My Mother, Mrs. Boykin and Johnny Hurd because those were the first houses.

Q. What use was that road put to during that time?

A. For the public in general.

Q. All right. Just tell the jury who of the public used it.

A. Well, people that was selling ice, and it was a store there by Mrs. Boykin, and the milkman and the soda water trucks, iceman and everybody else."

*    *    *    *    *    *

"Q. What is your—outside of the oil and gas that is reserved in your deed, do you claim any other—

A. I claim—

Q. —right-of-way or things of that kind across there?

A. I claim the right-of-way, sure I claim the right-of-way."

*    *    *    *    *    *

On cross-examination, Beulah Smith Mc-Nary, testified, in part, as follows:

*    *    *    *    *    *

"A. And after the house was built, we used it for a public road." ·

*    *    *    *    *    *

"A. Not only my family, but the public.

Q. Okay. Well, now, what public traveled over it?

A. Peddlers would come down there to sell stuff."

*    *    *    *    *    *

"A. Well during that period of time before you got the land, your neighbors and peddlers and delivery men and so forth went up and down that roadway to get to and from your folks' house and also to your neighbors' houses, didn't they?

A. That's right.

Q. Was that the purpose of it?

A. Un-huh."

*    *    *    *    *    *

"Q. So your Mother furnished Mr. Pruitt a road there.

A. That's right.

Q. And she is the one that gave him permission to—

A. She furnished the road to the public, it was a public road."

*    *    *    *    *    *

"Q. And you decided that you ought to close the road down.

A. No, I didn't decide to close the road down because I was always taught that I couldn't close a public road, because my Mother told me you couldn't close a public road."

*    *    *    *    *    *

"Q. Okay, did you bring this lawsuit for peace sake?

A. I brought this lawsuit so I could have a way in and out for the public.

Q. Are you bringing this lawsuit for yourself and for your family or are you bringing if for the public?

A. I'm bringing it for the public.

Q. So you're not bringing this lawsuit for yourself.

A. Well, I'm bringing it for the public because it's always been a public road.

Q. At your own expense.

A. At my own expense.

Q. At your own expense, you have been good enough to do this for the public.

A. That's right  *  *  *"

*    *    *    *    *    *

"Q. Did your parents or your grandparents at any time that you know of ever prevent any neighbors from coming up there and visiting them or anybody from coming up and using that road?

A. No, my parents never did prevent anybody from using that road."

*    *    *    *    *    *

"A. —So she dedicated the road."

*    *    *    *    *    *

On cross-examination, Irene Denman, testified, in part, as follows:

"Q. And anybody using that road whether it be the iceman or milkman or whoever—.

A. Anybody had the privilege to use the road.

Q. So anyone, including neighbors, the iceman or milkman or anybody else that came up that road.

A. Right."

*   *   *   *   *   *

Upon re-direct examination, Irene Denman, further testified, in part, as follows:

"Q. As far as the road in front of Beulah's (Beulah Smith McNary) house and North of this filling station, how long do you know that that road has been open to the public?

A. It has been open ever since along in the thirties.

Q. Since the thirties?

A. Yes, sir.

Q. During the time that you have known that road, have you ever heard of anybody trying to block or stop people from using that road?

A. No.

Q. Have you ever heard of anybody having to get permission from any of the members of the family of the Smiths, the Keys or any of you all's family to use the road?

A. No.

Q. Since they built that station there, have you been able to use that road like you used it before?

A. No, I can't."

*   *   *   *   *   *

Charley Key testified on cross-examination, in part, as follows:

"Q. Okay. Now, when some other houses were built out there, people traveling that road were going to and from those houses and also Mary Smith's house, and anybody that traveled that road was going either to Mary Smith's house or to the other folks' houses up there.

A. They were going to her house or the houses of these other people."

*   *   *   *   *   *

"Q. And everytime that you traveled that road you know that you had the permission of Mary (Smith) or from the other people that had houses up there to travel it, didn't you?

A. Well it was a public road."

*   *   *   *   *   *

"Q. They owned that property?

A. That's right, but it was give to a road.

Q. And as long as you ever traveled that, it was your understanding that it was agreeable with Mary (Smith) or Beulah (Smith McNary) or with Matthew (Smith) or whoever owned that property that you could go across that property, isn't that right?

A. Yes, it was agreed it was a road."

*   *   *   *   *   *

"Q. And they were the only ones that would have objected because they were the only ones that owned it, isn't that right?

A. Well, after they gave it as a road, everybody used it, they couldn't stop it."

*   *   *   *   *   *

Sam Carr, a witness for the plaintiffs, testified, in part, as follows:

"Q. Yes, coming off Pine Tree Road, going back to Conrad Street.

A. Yes, I guess that is for the public, anyone that wants to go down there."

*   *   *   *   *   *

Easter Benton, a witness for the plaintiffs, testified, in part as follows:

"Q. Who used that road from that time up until the time the filling station was built?

A. Anybody used that wanted to."

*   *   *   *   *   *

On cross-examination, she further testified:

"A. Anybody that wanted to traveled it.

Q. That's what I say. It was open to everybody, wasn't it?

A. Yes, it was a street."

\* \* \* \* \* \*

Fred K. Beaty, a witness for the plaintiff, testified, in part, as follows:

"Q. As far as you knew, anybody that wanted to use it could use it?

A. Yes, sir."

\* \* \* \* \* \*

Appellee, Jack Reeves, called as an adverse witness by appellants, admitted that he was familiar with Conrad Street, and testified, in part, as follows:

"Q. And are you familiar with the location of this road that came through there behind your station there now?

A. You mean—you are talking about—

Q. Conrad Street.

A. Yes, Sir.

Q. And you knew that street was there before you built this station, didn't you?

A. Yes, Sir.

Q. And it was visible to you and everybody that was in that area?

A. Yes, Sir."

\* \* \* \* \* \*

"Q. And it was an oil topped road?

A. Yes, Sir.

Q. And used by the public in general.

A. As far as I know."

This oral testimony of Jack Reeves confirmed the fact that Conrad Street was a public right-of-way. He was charged with the knowledge of the Resolution #204, passed by the Longview City Council which further confirmed the fact that Conrad Street was a public right-of-way. City of Dallas v. Coffin, Tex.Civ.App., 1953, 254 S.W.2d 203, w. r., n. r. e. It was a dedicated public road. Owens v. Hockett, 1952, 151 Tex. 503, 251 S.W. 957; Chambers County v. Frost et al, Tex. Civ.App., 1962, 356 S.W.2d 470, w. r., n. r. e.; 19 Tex.Jur.2d 201, § 20; Oswald v. Grenet, 1858, 22 Tex. 94. The Supreme Court has not seen fit to change the statement of the rule as laid down in the Grenet case, supra.

The purchaser of real property, knowing it is burdened with an easement of a public road for the public, takes the real estate subject thereto. Plaster v. Stutzman, Tex. Civ.App., 1928, 8 S.W.2d 750, N.W.H.

Estoppel, if it is applied, is more than an offset by the appellees actual knowledge. 22 Tex.Jur.2d 692, § 21; 28 Tex.Jur.2nd, 168 § 137. Appellees did not plead or prove estoppel.

The proof in the case shows that the Public Road or Street had been in continuous use for about 39 years prior to the time appellee built the filling station in 1968. It only takes ten years to acquire a right-of-way by limitations. It is uncontradicted that the public right-of-way was even dedicated long before 1954 and had been in use by the public continuously. 19 Tex.Jur.2d 193, § 16. Appellees waived estoppel by not pleading and proving the same. Lane v. Security Title and Trust Company, Tex.Civ.App., 1964, 382 S.W.2d 326, w. r., n. r. e.

If the trial court was going to submit the case to the jury on special issues he should have granted appellants requested special instructions that land may be dedicated in one or more ways, to-wit:

1. By written instrument placed of record by the landowner.

2. Orally by the landowner.

3. By opening a passageway and declaring its use is for the public.

4. Under the laws of Texas, by an easement may be acquired by prescription.

*Prescription* means the right-of-way may be by:

a. Open and notorious use;

b.  Or with knowledge and acquiescence on the part of the owner;

c.  That is adverse;

d.  Exclusive;

e.  Uninterrupted;

f.  And continuous use for a period of time of ten years or more.

It seems to me that the right-of-way by prescription that a suit by one person, individually, and in behalf of the public would certainly include those people who lived on the road that was closed in and it would not be necessary to include one or more of the other residents that are closed in to make the suit applicable, even though Beulah Smith McNary may have executed a deed which appellee later came into possession of the property, with actual notice of the right-of-way's existence. This right-of-way was orally dedicated and the public also gained control over it by prescription. 19 Tex.Jur.2d 193, § 16, and cases cited therein.

I would reverse the judgment of the trial court and render judgment in favor of appellants.